The fourth case for argument is United States ex rel., Kenneth Kraemer, et al., v. United Dairies, et al. Mr. Steinhoff? Thank you, Your Honor. Good morning. May it please the Court, Counsel. My name is Patrick B. Steinhoff. I'm the attorney for the appellant, Kenneth Kraemer, who was the relator below in this case. In this False Claims Act case, the district court found that appellees made false claims and statements to the USDA in connection with crop insurance reporting documents claiming that silage crops were grain corn crops and then receiving the coverage and the benefits that come with grain corn, which are different than silage. The district court found, however, that the false claims and the false statements were not made knowingly. So I'll address that finding. The biggest problem with that finding, I think, is that the district court applied the wrong legal standard, and I think that was true before the U.S. Supreme Court issued this new case, Shreddy, a week and a half ago that addresses the meaning of knowingly under the statute. Now, our standard review is clearly erroneous. That is correct, Your Honor. It's a clearly erroneous standard of review, but the Court can uphold a finding that's based on the wrong legal standard. What case are you relying on there? I am relying on Shull v. Dane, Column Quail, 561 F. 2nd, 152. An oldie but goodie. An oldie but a goodie. That's right, Your Honor. Well, wouldn't the standard review be de novo as to the legal standard? I don't know why. It would be de novo as to the legal standard, but I think as to the if the factual finding was premised on the wrong legal standard, then I think it has to be reversed. But the review of the factual findings are clearly erroneous. So, well, anyway, if it's under a correct legal standard, that would certainly be true. What's the basis for saying the judge applied the wrong legal standard? There's a couple, Your Honor. First, the judge did not view actual knowledge as a separate category of knowledge. There's a three-tier definition of knowledge in the False Claims Act. Actual knowledge, deliberate disregard for the truth or falsity of the claim, and then reckless disregard for the truth or falsity of the claim. I think here the district court — What's the basis for saying the court didn't do it, as opposed to just didn't see the need to march down through irrelevant alternative factors? Your Honor, I don't think the district court's findings make any sense unless it's viewed through the prism of reckless disregard for the truth and ignorance. Okay, but that's not a wrong legal standard. Well, I think it is, Your Honor. It's like the Griffin, the six-part Griffin standard that we love for a Fourth Amendment issue. And we've now made it clear that the district court doesn't have to march through all six if it correctly applies the ones that are relevant. Well, I think the district court did not correctly apply the reckless disregard standard. But there was a lot of evidence and testimony presented at trial on the issue of actual knowledge. The district court did not make findings on any of it. The district court did not. Tell me a finding that wasn't made. Your Honor, the, so the court made a finding that the appellees did not knowingly make their false claims. It, in its explanation of its reasoning. Wait a minute. You just said it didn't make a finding in unwilling. That was the core finding. That's the finding we're reviewing. That's correct, Your Honor. But the district court did not look at actual knowledge when it made that finding. It looked at cases that I call certification compliance cases which relate to the. You call it that. I wouldn't, I don't think that's, I think that's just sort of mucking around with descriptive language. Well, Your Honor, I mean, let's take the Donegan case decided by. I'm going to talk about your actual knowledge theory. I got a lot of questions about that, which lead to my concluding that the court didn't need to talk about it. Okay, Your Honor. Well, we had a testimony at trial that my client, Mr. Kramer, knew that these claims were false. I know. And we have testimony at trial that he. I think it's a so what. Or if it's a so what, then the court didn't need to discuss it, right? And there's no error of law. Your Honor, I think the court. It's not a so what. I mean. I know you argue that, and we can talk about that. But I'm just getting at, this is clear error review, and your attempts to cram it into a Danoville pigeonhole, I don't think work. Okay, Your Honor. Well, let's talk about. Well, I think they do work, Your Honor. I think the. So the district court was looking at these cases that arise from the Safeco decision in the Seventh Circuit that say that if you act on a objectively reasonable interpretation of ambiguous ordinance and there's no formal guidance that warns you away from that interpretation, then it's not, the false statement is not made knowingly. And I think. But are you sure that Eighth Circuit law was really the same as Seventh Circuit law? I'm not sure Donegan. My question about Donegan is whether that was a case where there was both subjective and objective reasonableness. Do you understand the point? I mean, the problem with the Seventh Circuit was they were saying if the reading was subjectively reasonable, then even if the people subjectively knew that the statement was false, there was no liability in the court, so that's not correct. But what makes you think Eighth Circuit law was the same as that? Well, Your Honor, I think in Donegan, the court cites the Safeco case, and that's where the standard comes from. Okay. And I think the U.S. Supreme Court in this Neuschwede case displaces all of that with a new standard for. So you just think Donegan was the same as the Seventh Circuit, basically, is what you're saying? I think the source of Donegan was in part the Seventh Circuit case, and I think that entire line of cases has been displaced now by this case that was just issued last, the week before last, by the U.S. Supreme Court, the Neuschwede case, which says that if you know of a substantial and unjustifiable risk that the claim was false, then you are acting in reckless disregard of the truth and falsity of the claim. And I think, just looking at that standard, that there is substantial evidence in the record that because Mr. Kramer told the managing partner of United Dairies that the claims, the statements that the dairies were making to the USDA were false, and walked him through the documentation he had of that, at that point, the partnership of Pelley's had a substantial knowledge of, they were aware of a substantial and unjustifiable risk that the statements they were making to the USDA were false. So I think the findings on actual knowledge need to be reversed based on, because they are clearly erroneous. Now, what case holds that a farmer may not rely on an insurance agent for compliance, or going further, must, even if it's reasonably relying on the insurance agent's advice, opinion as to what's the proper way to do these things, has to call timeout and stop the train, and just because one of its members says, I think this is the wrong way to do it, I disagree with the crop insurance agent? Your Honor, the policy itself says that the agent cannot modify the terms of the policy. That's not relevant. I think it is relevant, Your Honor. I don't think it's conclusive. The agent says, with years and years of audits supporting this, that this is the right way to do it. And the agent was wrong, Your Honor, and I think that is not established whatsoever. I hate to do this, but, you know, years before these insurance policies ever existed, there was a price support plan that operated for corn. And in those days, people used to all the time say, this is corn for grain, knowing that they were going to chop most of it for silage eventually anyhow. And they still made the price support payments. I only know that because, you know, I grew up in a county where there were a lot of dairy cows, but there was, like, no corn for grain because the growing seasons were, you know, markedly shorter in those days, and everybody was filing these claims. And so you've got farmers that have been dealing with this, the system that existed before. The insurance system is mostly the same, and the insurance agents are telling them they're all the same. And now you're saying that because Mr. Kramer came in here and said, blah, blah, blah, blah, blah, that now that they had, that they were acting in reckless disregard. And why is Mr. Kramer more of an expert than the insurance agents and the way the policy has been applied for, like, 40 years? Your Honor, well, the district court found that Mr. Penland is right. I get that, you know. And you could do that by reading the statute and reading the policies and reading the regulations, right? But do we, is that the standard we hold farmers to? Well, I think if somebody tells you you're doing it wrong and explains to you why. And the guy that sells you the product says you're not doing it wrong. Well, I think you, the risk that your agent is wrong is on you if you. The district court is not the U.S. Supreme Court. So the fact the district court said it's wrong in a ruling that is not up before us on appeal is not exactly a done deal on that question. Well, Your Honor, nevertheless, I mean, we have a finding that the claim is false. We have facts in the record that show that Mr. Kramer told his managing partner that it was false and it did nothing. The partnership did nothing. And then we have two years later, attorneys for Mr. Kramer contacted the attorneys for the dairy. At that point, they presumably read the policy and they changed their practices prospectively. So I think that shows what would have happened if the dairies had done something besides just blindly rely on their crop insurance agent at the time that Mr. Kramer told them, conveyed his actual knowledge that the claims were false to them in 2014. This leads into your actual knowledge argument, which I wanted to ask you. What is your best Minnesota case for the notion that the knowledge was of Mr. Kramer, who was on the outs with management, that what he tells them is imputed to the partnership? Your Honor, I don't have a Minnesota case. I have an Eighth Circuit case. If you're talking about Judge Colleton's opinion in Grassbrook, he may disagree, but I don't think it addresses this point. I'm not aware of any Minnesota case that says that in this kind of a circumstance, a knowledge of a general partner is imputed to the General partner just means not limited, right? It doesn't mean managing partner. That is correct. But I see that as black leather partnership law. I think that's laid out in Grassbrook. Your Honor, I'm out of time, but I think I've answered your question as best I can. Well, then just quickly on the knowingly retained theory. Unless United Dairies knew they were over payments when they changed their practice in response to the warning and complaint of Mr. Kramer and his attorney, if they just changed their reporting to avoid the risk of litigation, why does the change prove unlawful retention? Your Honor, there's no evidence in the record why they changed their practice except that it was on the advice of their attorney. I mean, they could have explained it more than that. It was their attorney, right? Excuse me, Your Honor. Was it their attorney? I thought it was Mr. Kramer's attorney. Mr. Kramer's attorney sent a letter to the dairies' attorney who advised. The testimony was that they changed their practices prospectively based on advice from counsel. Do you say that proves unlawful retention? I think that proves that they knew that their past reporting was wrong. Oh, come on. Well, I think it does, Your Honor. You know, that's back to Judge Erickson's point. The fact that Mr. Kramer disagreed with everything that everybody had been doing for decades all of a sudden establishes that there was actual knowledge of wrong? Can I respond to the decades point, Your Honor? I mean, this policy provision dates back to 2010, I think. I mean, there was a change in the policy that said that you cannot get the price drop component of revenue protection for silage corn. So that started in 2010. It's in the record. There's a policy provision change form. So it's not decades. It's a relatively new policy. Relatively new, but the agents have been saying the same thing, basically, since they started selling insurance in lieu of the old price import system, which goes back 25 years. That might be true. I'm sure it is. But, I mean, Mr. Kramer knew about the coverage change. He told his partners about it. And I think that, at the very least, makes what they did recklessly disregarding of the truth. Thank you, Your Honor. Good morning, Your Honors. My name is Attorney Gary Lustig. I'm here representing the Apalis, the farmers in this case. We very much appreciate your time. My clients are a group of family dairy farms that have joined together. Counsel, I will do the best to answer any questions that you have based on your questions this morning to Mr. Steinhoff. The case does break down into three general categories of decision. It was whether there was the knowledge element, whether there was subject matter jurisdiction, and then this reverse false claim act that you spoke about. Let me tell you what strikes me as the critical issue here, and you tell me if I'm wrong or not, and that is whether the district court's finding that BMR seed was not, quote, adapted for silage is critical. I think the district court found that it was adapt. It was a dual purpose. So that BMR corn. Within the meaning of the regulation, it was not adapted for silage. Correct. The court found that. Without that finding, it's a much more difficult case for your clients, isn't it? What the court relied on. Indeed, I think it's critical to whether it was appropriate to just continue relying on the seed agent advice and custom and practice. The handbook is the place at which the regulation requires the intended method of harvest. There is a statutory CFR provision that does limit the insurance of grain corn that is a silage specific only, which is what you're addressing. Right. The adapted. What the court found on that, based on credible testimony, is that the agronomist, Jennifer Miller, who was the agronomist for all of the dairies, the defendant dairies in the case, that she was from Minnesota. She worked with 90-some farmers, many of them dairy farmers, that she recommended BMR corn, often did because it produced high yields of grain corn, good silage. It had the stover, so it worked good for silage, but it could be used for grain corn just as well. There was credible testimony found by the court that the yields for the BMR corn was as great or greater than what were, in quotes, traditional grain corn. And it was used by farmers for all different purposes. That the price of the seed was no greater than other types of corn that were more traditionally considered grain corn. And the only evidence that controverted any of that was the plaintiff's brought in, Steve Plain, who indicated he based on himself, that he was the seed breeder in question, and defined it himself that adapted meant what he was doing in some other state for a private company, and trying to determine which varieties worked best for different purposes. The testimony was that he, his testimony in the case, his position on behalf of mycogen, caused him to be terminated by mycogen. That he never had been to Minnesota, he didn't know any of the growing aspects of Minnesota in these areas. Jennifer Miller was the agronomist on the ground that the court found her testimony credible, that it was used by farmers for both grain and for silage. It held the stock, it didn't have, it didn't fall over, it didn't have standing issues. That the agents, both the agent, the insurance agent for the dairies, and for the partnership dairies, and for Dairidge and Marthaler, they both considered BMR corn to be dual purpose. They had checked with the carriers, and so the system sets up this dual public-private process with the FCIC, the RMA, and then with the carriers, and then with the agents. And if the farmers have a question, they go to their agent. If the agent has a question, they go to their carrier, the AIP, and they did that. Don't we have a finding, though, that the farmers intended these crops to be used for silage all along? They intended a majority of the crops to be used for silage all along. And didn't they put on Form 478 intended use grain? Your Honor, I believe it's Form 578. Excuse me. Same form. Excuse me. And so with the testimony that the court found. Didn't they put intended use GR on that form? They did. And that's the statement the court said was false? I believe that is, they actually then took that form, went to their insurance agent, and they insured the corn for grain corn with revenue protection policies, although they intended that some of it at least, the majority of it, facts were found, that it would be used for silage. The Form 578, and we set this out in our brief, for corn it only has one option on that form. And that is GR for grain. In the key at the bottom. On the key in the bottom. And so F and G for forage has legumes, alfalfa, those type of things. So you're sort of blaming the instructions on the form that even though farmers intend forage, you think the form tells them to put the intended grain? It has no other option with what the key sets out to put on it. Okay. And they also checked with the FSA, and the court found credible testimony that they relied on the FSA, and the FSA would tell them if it's corn you put on that for grain corn. Okay. And so they did do that. The other concern I have is how do we know that the judge didn't apply the incorrect legal standard that was superseded in the super value case? You know, the judge cites our Dunagan case in the summary judgment order and talks about an objectively reasonable interpretation of the regulations. Judge Frank did cite the Dunagan opinion, and the Dunagan opinion does include the objective and a subjective component. It's a three-pronged test in Dunagan. And the test that sets out in Dunagan. Where do you see the three prongs? It's within the case, and it indicates that the statute or rule in question that's being interpreted was not defined and was ambiguous. Secondly, the interpretation of the actor, in this case the dairies, was reasonable. And thirdly, that the reasonable interpretation belies the center necessary to establish the claim under the FCA, under the False Claim Act. So that what Schutte refined on SAFCO, SAFCO is a Fair Debt Collection Act standard, and Schutte came out and said that's not the correct standard for an FCA case. For an FCA case, you look at primarily not because the Seventh Circuit had not had, like Dunagan, an objective and a subjective component to it. So in the Seventh Circuit, a person could think they were doing it wrong. Well, I don't know. The Seventh Circuit cited Dunagan and said, we agree with Dunagan. And then the Supreme Court reversed them. I understand that, but that raises a concern whether our district court here was also applying an incorrect standard. Well, Dunagan does both, and so it wouldn't be improper to agree with Dunagan in the Seventh Circuit as to that part. But even under the Schutte or Schutte case, what happened in that case is the actors retail pharmacy chains, large ones. What was usual and under the circumstances, what was their usual charge that they were charging? They asked, the retailers asked, the actual Medicare people that they worked with, how should we insure this? What price should we use as our usual and customary price? And they were told, well, not the low one. That's only $4 a month. You have to use the $30 a month because Safeco, our super value, and Safeway were competing with Walmart in that case. And they were going down from their usual and customary charge of $30 to $4 a month for certain generic drugs to keep up with Walmart. And then they reported for Medicare reimbursement the $30. And they had asked the chain of people within the Medicare reimbursement process, how should we be doing it? And they were warned away that if you do this, you're doing it wrong because your usual price is your $30, not your $4. But they still sought reimbursement for $30. And they knew what was wrong, and they still did it. And then they argued, yeah, but a reasonable person might think. So the analogy here, the argument here would be our insurance guys were telling us we could claim it as grain. Kramer told us that's a false statement. And the argument would be that the farmers knew Kramer was right, but they thought we can slide by with the grain claim because we can rely on the insurance guys and claim it was objectively reasonable. And if Judge Frank was applying the wrong standard, he might have said, well, it was objectively reasonable to rely on the insurance men, even though they knew subjectively through what they learned from Kramer that they were making a false statement. So my concern is just whether the judge was making that distinction analytically. Because if, I grant you, if he found, well, subjectively they believed that it was true because they relied on the insurance agents, then that's consistent with super value, but not if he did it the other way. I understand. Two things. One is what Kramer argues in his brief is different than what came out at trial. What came out at his trial is all Kramer did was ask to go to Nick Ridgway, the managing partner. I'd like to talk to you. It wasn't at a partnership meeting. He just went to Nick Ridgway, and he told Nick Ridgway, I have some concerns. And what his concerns were was not about the intended method of harvest as far as insuring, and that's not what the complaint was about. It was about the BMR issue. And Kramer said you can't insure BMR. Nick Ridgway then went to Tom Landwehr, and Tom Landwehr said, hey, we had a loss this year. Before we get the check, we get audited. And the court found credible that the audit was a reasonable basis that a farmer would subjectively believe, if they were still paid, that they were doing everything right, which would make sense. If you get an audit and they still give you your money, very good basis for a person to subjectively believe that they were doing it right. And so that is all Kramer ever did when he came to them and said you guys are doing it right. What the courts found as far as other basis is why it's reasonable they thought it was right. They checked. This wasn't anyone hiding their head in the sand or closing their eyes or just hoping if they got caught it was reasonable. They went through. They checked with their agent. They checked with every agent. They checked with the AIPs. The agents credibly testified based on the court, on a Ronia standard, and found that that is how you would determine it. You would go with your agent. They had Don Voy testify, who had been the regional manager of RMA for years in this part of the country, that if you come to our office, we're not going to talk to you. We're going to send you to your agent. If you don't get the answer from the agent, then you go to the carrier. And if you don't get the answer from the carrier, the carrier come from us. There's meetings where it's talked about. Farmers aren't welcome. They have to go to their agent. And they went to their agent, and the agents testified. Not only did they tell these, the defendants in this case, the appellees here, this is how you do it. They testified, we've got a lot of dairy farmers. We tell them all to insure as grain corn. We know what you're using it for, and it's fine. You can insure it that way. And as far as BMR, they specifically said, you can insure BMR as grain corn. In fact, one of the agents, Benfield, was a seed dealer and sold BMR corn to two of the dairies, Dairy Ridge and Marthaler. Marthaler was not a dairy farm. He had contracts those two years with the United Dairies. And that you could do it that way. They never tried to not find out. They did everything they could to find out, and they relied on that. And the court found that you can rely on it, because that's, who else do you have to go? These are farmers. They're not, you can't even get the handbook. One of the things I find confusing, at least in the way this is argued, is the reporting versus the harvest. And if BMR is not silage, it's not adapted under the statute, then the reporting is not, if it's consistent with the agents, there's no FCA liability from the reporting, or does plaintiff claim there is? I don't think there's any liability from the reporting. That's when the chickens come home to roost, so to speak. That's when the farmer decides is it going to be green, or is it going to be harvest, or silage. And then it goes to the, if it's supposed to tell the insurer that, and that dictates how much silage there is. Right, and they're allowed to tell the insurer if they change the way they're going to harvest it, and they did that in every case it was found. And the forms then would say UH on them. Unharvested, meaning it was unharvested when the adjuster went out and appraised it. You've seen the fall strips of corn out in the field. Every one of those means they had insured it as green, and they're going to take it as silage, because otherwise you don't need appraisal. Because if you take it as green, you get a scale ticket if you go into the elevator and drop the corn off, or you put it in a bin and someone comes out and measures it's in the bin. And everybody knew, and the court found credible testimony, that these farmers are doing exactly what they did every time. Notwithstanding, if Kramer never came in and talked to anybody, that all occurred, and was occurring for years before that and during all of the years in question. So the insurer in 2013 and 14 paid benefits based on what it insured. It paid on what it was insured, correct. So where's the FCA violation? I don't know that there is one, and the audit showed the government didn't think so. The government's complaint should be with the insurer. Right. I mean, we're subsidizing your insurance, and you're foolishly insuring for more than you should. Maybe the wrong people were brought into this case, but the farmers did what they understood was the right thing to do. I'd ask you to affirm the judgment of the district court. Thank you. Thank you. Well, I see time is up. The case has been thoroughly briefed and argued, and we will take it under advice.